We'll hear argument this morning in Case 12-1117, Plumhoff v. Rickard. Mr. Mosley. Mr. Chief Justice, and may it please the Court, the Sixth Circuit completely failed to analyze the second prong of a qualified immunity defense in this case, and that is whether the law was clearly established at the time of the incident in question such that every reasonable officer would know whether or not the action was constitutional or not. Therefore, the Petitioners were not given fair warning that the use of force in this case, if it was prohibited, was prohibited. And they retained immunity, and the Sixth Circuit must be reversed. This is the argument we wish to emphasize today relating to the second prong, what was traditionally the second prong before Saucer, of course, the rigid order of battle was changed. Had the Sixth Circuit reviewed its own cases as of 2004, it should have concluded that Petitioners were entitled to qualified immunity. Scalia. I thought it said, did it not say in its opinion that there was room for disagreement over whether this was reasonable or not? Did it have some such statement? They could not conclude that it was reasonable as a matter of law, is the statement I recall, Justice Scalia. And in that regard, that's a legal question. It had to answer that question. But it didn't do so with reference to prior case law to 2004. If anything, it looked at Scott v. Harris from 2007 and said that there was a factual distinction between Scott and the devil was in the details, and therefore it affirmed the district court, which I can – I submit made the same mistake, because the district court was looking at Smith v. Kupp from the Sixth Circuit, which was a 2005 opinion, to determine whether or not the officers violated clearly established law. Ginsburg. Would the court, in your view, ever have an occasion to decide whether conduct of this nature violates the Fourth Amendment? If you were right about clearly, clearly established, then could this – could the underlying constitutional question ever be what would be the posture of the case in which it could be decided? Well, I mean, it's – we've argued, of course, in our briefs, Justice Ginsburg, that it should be decided in this case, although today we're emphasizing the second prong. But what would be the posture of such a case? The United States has suggested that there's factual complexities in this case that make it difficult for the Court to rule whether or not on the merits there was a constitutional violation. And I'm not – of course, we differ with that to the extent that we've argued there was not a constitutional violation. But as in Pearson, where the issue of whether the law was clearly established can be resolved relatively easily, I submit that in this case that is the case. And the Court should rule that the Petitioners were entitled to qualified immunity. Isn't it the case that the Court has discretion to reach the second prong if it wants to? The Court could say it wasn't reasonably – it wasn't clearly established, but it was an unreasonable seizure. It could do that, couldn't it? The way I read Pearson, Justice Alito, no. The way I read Pearson, they – Pearson's dictate is that they must proceed to the second prong if they conclude there was sufficient facts to conclude that there was a constitutional violation. They still have to decide. One is the question of – Alito, that wasn't my question. The Court has to – ruling on qualified immunity, it has to decide whether there was – whether the law was reasonably – the rule that's being applied was reasonably – was clearly established. But having done that, even if it says it was, and therefore the defendant is entitled to qualified immunity, doesn't Pearson say that the Court has discretion about whether to go on to the second prong? Oh, this is in relation to Justice Ginsburg's question. I think so, yes. The Court certainly has the power to make a ruling on the merits question. And in this case, if the Court found it wise to do so, we've argued that on the merits, this was a constitutional use of force under the Fourth Amendment because it was dangerous. The chase exceeded speeds of 100 miles an hour. There was weaving in and out of traffic. There was a time when a particular person pulling a boat was cut off. Even in the parking lot, the Respondent's decedent never threw his hands up, never indicated surrender, maneuvered his car in such a manner that a reasonable officer could conclude that he was in a threat of serious harm to himself. In any event, every reasonable officer could not conclude – it is not correct that every reasonable officer would not conclude that it was unconstitutional. Is there any situation in which the application of lethal force during a high-speed chase, in your view, would not be justified? Yes, Your Honor. Give me an example. About a high-speed chase, not unlike this one, is there any situation in which it would violate clearly established constitutional law for the police to use lethal force? Well, I'll give you one circumstance. If this Court had a case where it ruled, where there was a prior ruling, of course, that given conduct violated the Constitution, but as far as me coming up with a particular event, I suspect that somebody fleeing at the speed limit, not endangering other drivers – I hate to use television as an example, but perhaps the way the white Ford Bronco fled in the early 90s that everybody saw on TV. That seemed to be relatively non-dangerous, or at least not a danger of serious physical injury. In this case, however, there was a danger of serious physical injury, given the undisputed events in this case. In fact, the Respondents below argued that the speed exceeded 100 miles an hour. They argued this was a dangerous chase. On page 16 of their memorandum in response to our motion for summary judgment. So, and, you know, of course, there's a jurisdictional issue here that I'd like to briefly talk about. Yes, I'd like you to talk about that. Well, below in the Sixth Circuit, the Petitioners were willing to concede any alleged factual disputes, not legal disputes, but factual disputes in the light most favorable to the Respondent. We're still willing to do that. For purposes of argument's sake, any alleged disputes should be construed, which is proper under Scott v. Harris, to determine the historical facts. And is that how you think the jurisdictional question should be resolved, that whenever, as you know, there's a disagreement in the courts of appeals as to what you do when there are claims that there are factual disputes? Some courts – well, we've held that where the only issue raised is a factual dispute, there's no jurisdiction. Some courts say that so long as you assert a claim to qualified immunity, there is jurisdiction. Okay? Let's assume that that's the rule. What do we do with factual disputes? Is your position that you simply assume them to be in the Respondent's favor? Only to the extent supportable by the record as Your Honor held, as this Court held, rather, in footnote 8 of Scott v. Harris. So, yes, I do think that there are cases where. Well, you would say genuine factual disputes. I mean, if there's something that is not at all frivolous. I mean, it's not supported by the record. I wouldn't call that a genuine factual dispute. I think it wastes judicial resources if there is not true genuineness with respect to a particular fact, if there is no support for it in the record. And clearly established, the argument has been raised for the Court not to go ahead, assume jurisdiction, and assume the facts in the light most favorable to the extent supportable by the record, Your Honor. And how does that work out here? In this case, respectfully, I don't think it's very important. I think that there are maybe a couple of alleged factual disputes that even if you assume them in the light most favorable to the Respondent, they do not affect this Court's analysis under the second prong of qualified immunity, because this was indisputably a dangerous car chase and indisputably the Respondent never gave up before force was used. Scalia. And you would say that it doesn't really matter whether he bumped the police cruisers when he was finally cornered, whether he tried to back up into one of the officers, that all of that is just excrescences, that it was enough to justify the shooting that he was driving at 100 miles an hour, swerving around the road, endangering human life, and would likely continue that if they let him get away. Two responses, Your Honor. First of all, I do not concede that those facts are in dispute. Rather, if you look at the second volume of the Joint Appendix towards the end, the Respondent had admitted those in the Supreme Court, in the summary judgment record below, that there were some qualifications that these are legal disputes. Had admitted what? Had admitted that Officer Gardner's car was, in fact, bumped by Respondent Decedent's car, that the cars were rocking back and forth, that the front wheels were spinning. That occurred. That was indisputably occurred. That indisputably shows on Unit 286, which is Galtelli's video. And then it is indisputable that Officer Ellis had to step out of the way when Mr. Rickard backed up. Those things were not in dispute. So, you know, as that goes, I wouldn't say that those things have to be assumed in the Respondent's favor, because those things happen and the Respondent doesn't take issue with those things. Well, he does in his briefing here. He takes issue with characterizations. And what I submit is that we've characterized facts in this case, no doubt. They've characterized facts in this case. Just as in Scott v. Harris, the video in many ways speaks for itself. The video in many ways, in every way, in my opinion, shows that this was dangerous. It continued to be dangerous, and Mr. Rickard never relented and never gave up. And one important fact that is also undisputed is that at the time that that contact, however you characterize it, was made between the Galtelli car and Mr. Rickard's car, Officer — I mean, Gardner's car and Rickard's car, Officer Gardner was exiting his patrol car. So there was much made about the fact that Officer Plumhoff was to the side, the front side of the car. Officer Gardner was not to the front side of the car. Officer Gardner was exiting the car that was being contacted and approaching in front. That is a danger, at least a reasonable officer on the scene, without the benefit of hindsight, without — out of the quiet of the courtroom, could conclude that he was in danger of serious injury. Kennedy. Assuming that at some point in this case, either now or on remand, it's appropriate and necessary for us to State, set forth what the rule ought to be, what effect, if any, do you give to the fact that there was a passenger in the car? A passenger who apparently was not involved in any illegal activity? The passenger did not make Mr. Rickard less dangerous. However, I know of no legal framework as of 2004. I do understand your question is about the merits. But it makes the police reaction more dangerous. It does, but we still look at the relative culpability of the driver. We look at the — I do think under the totality of the circumstances, you consider the fact that there is a passenger, but you also consider the rights of the innocent public, and it did not make Mr. Rickard less dangerous. I agree with you there. Scalia. I could see how the passenger could complain, but I can't see how the criminal, the fleeing felon who put the passenger in danger, can say you shouldn't have shot because, oh, you hurt my passenger. Isn't there some problem of his standing to complain about that problem? Precisely. And we've, of course, argued that. It defies logic to me for Mr. Rickard to have put Ms. Allen in danger and then invoke her safety as a reason why he should be free from the use of force when he is endangering the innocent public. Did Allen bring a suit? Yes, Your Honor. And was that settled out of court or something? No, Your Honor. That remains in the Western District of Tennessee. Oh, it remains. And the issue there, of course, is under the Fourth Amendment, and the shock's the conscience standard. But as of 2004 in the Sixth Circuit, go back to what I'm emphasizing here today in the second prong, there wasn't a case that suggested that the driver could invoke the passenger's safety as some means to suggest that the force was excessive. Yes, I understand that. And although we're going beyond the necessities of the case, is the rule that the driver can have a shock's the conscience test and it's not limited to the Fourth Amendment, even if the driver is? Is that the way it works? Well, it's interesting. The circuits go various ways. The Sixth Circuit has vacillated on the issue of whether there's a Fourth Amendment claim of an unintentional, unreasonable seizure, which to me defies logic. But there is clearly a shock's the conscience standard. And under Lewis v. Sacramento, the intent to harm standard under the Fourteenth Amendment, we were granted summary judgment, the Petitioners were granted summary judgment as to Ms. Allen's claim, a State's claim in that regard. But the Court is now reconsidering in the Western District of Arkansas, the Fourth Amendment of Tennessee, the Fourth Amendment claim. The Respondent, for the Respondent's part, they haven't shown clearly established law violated in this case by Petitioners' actions. And it's important that if not stopped in this case, I think reasonable officers could conclude that Rickard would continue to pose a risk. Now, what's important about the prior case law up to 2004 in the Sixth Circuit is that those cases, Smith v. Freeland, Scott v. Clay County, in the Eighth Circuit the case of Cole v. Bone, those officers at that time didn't shoot when somebody was about to run over someone else. There was not an immediate threat that somebody was just like in Scott v. Harris. Officers often wait for a time to take action when they don't see civilians around. And to suggest that, you know, somebody has to almost be run over before deadly force can be used in a situation where serious harm or injury has been threatened would throw law enforcement into chaos, and I respectfully submit it would probably weaken law enforcement in this country. I'd like to reserve the remainder of my time. Thank you, Mr. Mosley. Mr. Bash. Mr. Chief Justice, and may it please the Court. I think the correct disposition of this case follows from two propositions. One, there is some level of reckless driving in response to a police pursuit that authorizes the use of deadly force, some level, in a high-speed chase. Second, it was not beyond debate in 2004 in the relevant circuits here that the driving that the undisputed facts show in this case would have authorized deadly force. It might have been wrong as a matter of the Fourth Amendment, but it was not clearly established. Respondents have not pointed to a single circuit case that would have given officers clear notice that the undisputed conduct here would not authorize the use of deadly force. Mr. Bash, could I go back to Justice Ginsburg's question, because this is an area in which there's no alternative way, really, to develop legal standards other than by doing it in these kinds of cases. So if we only focus on the clearly established prong, case after case after case, we don't make much progress in actually telling police officers where the line is. So how do we do that? Why shouldn't we do it here? When should we do it? I think the general point is correct, and as we say in our brief, it would hinder the development of constitutional law if courts never reached the merits question. And as the Department of Justice, we have an interest in that, because we prosecute State officials for civil rights violations, and there's a similar standard of clearly established in the criminal context. Our only point here is not that courts should never reach the merits in these cases. It's that this is a particularly bad vehicle, particularly for this Court, which even in nonqualified immunity cases often lets difficult constitutional issues percolate among lower courts. One, the lower courts and really the parties didn't distinguish between the different officers here. Three officers didn't fire their weapons. Maybe they're the easy case. But two officers, although it might be disputed whether assaults occurred, heard over the radio that assaults occurred. That's what they say in their affidavits. That's at 213 through 225 of the JA, and you can hear on the Galtelli video, which is 286, that he heard the report of the assaults. That's a wrinkle in the constitutional analysis that really hasn't been explored by the lower court opinions in this case and by the parties in this case. Roberts. Mr. Bash, that question about the development of the underlying law, that's an issue that we faced and decided when we overturned the prior rule that there was a particular order of battle and you had to decide the constitutional issue first, isn't it? That's true, Mr. Chief Justice, but what Pearson said is that, as Justice Alito said earlier, it's discretionary, and one of the factors Pearson urged lower courts to consider in deciding whether to reach the merits question was whether this is the sort of issue that doesn't often arise in a context other than where qualified immunity is available. And I think that's what Justice Kagan's question was getting at. It can arise in some other contexts. For example, if there's a policy, a municipal policy that authorizes the use of force, you can oftentimes sue the municipality and they're not entitled to qualified immunity. They have, in fact, sued the municipality in this case, haven't they? They have. I believe that they sued the chief of police. I think they sued the municipality, too, but I don't think this was pursuant to an explicit policy. In fact, some of the policies at issue here during the JA at 398 through 412, I think, might have been violated. So I don't know that this is going to be the case where they can reach the merits because of the municipal liability. One other point on this question of the development of the law, I mean, Justice Kennedy noted in his dissent in Camretta v. Green, even clearly established cases sometimes can sort of more incrementally develop the law because certain principles are discussed in the case. Sotomayor, could I go back to a question the chief asked earlier, which is, is the use of deadly force always permitted in a high-speed chase? Let's assume a set of facts that's different from here, that they had surrounded the car and it had not moved. Could they have done what the police officer did here, fire into the car to get the guy to open up the door? Well, the use of deadly force is justified to protect injury to the public or to the officers. And if the circumstances of the case show that he has the suspect has no means of escape and getting back on the road based on where the cars are at the time of the stop. If they had been in a ditch or something. And there's no argument that the officers were in danger or maybe the vehicle was disabled. No. It's not punishment for having engaged in a high-speed pursuit. It's to protect people on the road. This case, it's very clear on the video that he was aiming to get back on the road. The district court found that. It's undisputed. And he could have kept driving if the officers hadn't fired shots. Now, maybe even taking all that into account, maybe it violated the Fourth Amendment here, maybe his conduct just wasn't dangerous enough. But I don't think it would have been beyond debate that it violated the Fourth Amendment in 2004 in these circuits getting these people. Scalia. Mr. Bash, what's the government's position on the jurisdictional question? We think there is subject matter jurisdiction in this case. And then let me explain both how I see the Johnson framework generally and then how I think it applies here. Johnson said that on an interlocutory appeal on a qualified immunity case, appellate courts do not have jurisdiction to review questions of evidentiary sufficiency. In other words, does the summary judgment record permit a jury to find a certain fact? I think there's two qualifications or caveats to that. One, in Scott v. Harris, although the Court didn't review Johnson, it said if it's blatant — if the fact found to be disputed by the district court, to be genuinely disputed, is blatantly contradicted by the record, and in particular their video evidence like we have here, the Court doesn't have to credit that. Second, I think there are certain sorts of issues that are in this context understood to be legal issues, not factual issues. So the factual issues are the historical facts, how fast was he driving, what was he doing, that kind of thing. But the question of what level threat he posed to the public or to officers' identities. Scalia, I understand that, but what about a dispute as to the purely factual issues? Well, if there is a dispute about that, does that mean the Court can't take the case? As I understood Johnson v. Jones, it said that. Now, Johnson v. Jones was based on practical considerations about conserving judicial resources and the nature of the question at issue. I think as you'll see — as you see in this case, and as the State amicus brief in this case makes clear, lower courts have struggled with that issue, and it may be that. How would you resolve the struggle is what I'm asking you. Well, like we said in Johnson v. Jones, we think that that is — Johnson adopted the incorrect position, and if it was properly presented in a case, we would ask that the Court reconsider the precedent. But that hasn't been raised here, but obviously it's within the Court's power to do so. What is the issue? Your point that if Johnson — your point that if Johnson remains on the book, there's no jurisdiction argument? No. There is jurisdiction in this case because on the undisputed facts, it was not clearly established in 2004 in the relevant circuits that these officers could not use deadly force. It's not necessary to reconsider Johnson to decide this case. The undisputed facts, and I'm happy to go through them, make clear that it was not clearly established in 2004 in this case. I took Justice Scalia to be asking a broader question about how Johnson has worked in practice in the lower courts. But Johnson involved only disputed facts. They asked this Court to resolve the factual question, period. I understood Johnson to say, of course you can't take that. But we have here a case where, although there may be disputed facts, the other side would say — or your side would say they're irrelevant. If the Court were to hold it on a core sort of qualified immunity appeal that actually raises the question about clearly established, that appellate courts have jurisdiction to consider subsidiary factual questions of the sort that I think you're referring to, we would agree with that position. Okay. And you would agree that we should resolve them in the Respondent's favor to the extent that the — that the record supports that? Correct. It would be the normal summary judgment standard. We don't think there are facts resolved in the Respondent's favor here that are necessary for the outcome in the context of this case. Mr. Besh, could I ask you a question? Putting aside the clearly established prong, and if you were just looking at the reasonableness of this conduct straight, the Fourth Amendment violation, two factors — and tell me how the government thinks they both play. One is the degree of force involved, the fact that 15-point blank shots were fired. And the other is what Justice Kennedy referred to before, the passenger in the car. So how do those two factors play in the Fourth Amendment question? So let me start with the latter. I think the — you can see arguments both ways on how the passenger fits in. On the one hand, Scott talked about the number of lives at risk and the relative culpability of people being put at risk. And so you could see how if the officer's actions are putting an innocent person at risk, maybe that plays in. But on the other hand, as Justice Scalia said, it's a little bit weird as a constitutional rule to say that the suspect puts somebody else's life in danger and gets a greater immunity from suit. It is a little bit weird. Kagan. But as I understand the way the lower courts have done this, it's to say that the passenger actually doesn't have a Fourth Amendment claim, so there's a shock to conscience test, which is, of course, a very high standard. That's true. And it's only the district court so far that has ruled on the passenger's Fourth Amendment claim here. And she may have an argument on appeal under Brennan v. California that she was seized. Brennan says if you pull over, you know, not through the use of force, through just an ordinary stop, pull over everybody in the car. If the passengers feel like they're not free to leave, they're seized as well constitutionally. We haven't evaluated on the facts of this case and how that applies to the sort of force used here, but she may have a Fourth Amendment claim. And it may make sense to filter those sorts of concerns about the innocent passenger through her claim rather than giving the suspect who actually put her in danger a greater immunity from the use of force. And I think the other question you asked about the degree of force. And I think that's part of the reasonableness analysis in the sense that officers generally should use only as much force as is necessary to end the threat, and sometimes a lesser degree of force will be sufficient. But in this case, at least as a matter of what the law was — in this case, the suspect probably would have gotten away before the police could use less force. I'll end there. Thank you, Mr. Bash. Mr. Smith.  Well, Your Honor, there — this case is a classic jury question. There are, contrary to the Petitioner's and Hamilkos' position, several genuine material issues of fact that are absolutely in dispute, and I would like to recite a few of those to set the preface to respond to some of the questions that have already been raised. We start with the fact that there was no chase at the time that these shots were fired. The chase had stopped. This situation was a controlled environment, not perfectly controlled, but there  Sotomayor, I'm sorry. I did see the film, and most of the — there were the three initial shots, and then the shots after the car was moving away from the police officers. How could you say most of those 15 shots were in a stopped, controlled position? The last 12 were not. The last 12. Let's divide it between 3 and 12. And it's one of the points I would like to make, Justice Sotomayor, is that we have to separate the shooting sequences in this case. Officer Plumhoff fired the initial three shots while the car is stopped. It is blocked in the preset. So why do we have all these other officers in here? They didn't fire any shots, Foreman, Ellis, and Evans. And that issue has not been asked at the district court. It has never been raised by the Petitioner in this case that they should be treated separately. The Sixth Circuit recognized that in a footnote, and that is an issue that should be presented to the district court, I would submit. But if we separate the — Sotomayor, so back to the — let's take the sequences. Okay. What was wrong with the 12 shots fired at the car as it was driving away? Okay. That's the first point of what was wrong, is that there was no danger at that point to the officers. And the only — the only excuse or justification that the officers could utilize at that time, because they were shot as the car was driving away and going down the street, the danger at that point that is being created by shooting is to the general public. But what do you think the officers should have done at that point? What should a reasonable officer do when there's been a high-speed chase and the car spins out of control, it's eventually surrounded by officers with guns pointed at the driver, demanding that he get out of — that he put up his hands, stop driving, they're pounding on the windows of the car, and the driver then begins to drive away? What does a — what do reasonable officers do? Maybe they — what they should do is to continue the chase indefinitely. I don't know. What do you think? The first part of your question brings in the first sequence when Officer Plumhoff shoots the first three shots. You referenced, Justice Alito, the statement that he's trying to get him to get out of the car, show his hands, et cetera. The video shows that that could not have happened. Officer Plumhoff gets out of his car, drawing his weapon, and goes to the car and immediately shoots. No delay, period. He immediately begins to drive away. The car is still trying to escape. The car is not stopped and, you know, the driver with his hands up. The car is still trying to get out of this encirclement by the other police cars, right? At that — Is he trying to get away at that point or not? You can't tell, because he's up — he's bumper to bumper with the Gardner car. It is true that the wheels spin forward. He's going to the — he's going to the police station? Well, we don't know. He wasn't given the opportunity. What we do know is this. There is evidence in this record from which a reasonable jury can conclude that he may have been trying to give up because Officer Forthman, who was the one that struck him and spun him out, says that once he turned onto Jackson Avenue, he hit his brakes hard. Now, he didn't hit his brakes hard in order to get away from him. And at that point, Officer Forthman says that caused him to hit him and spin him out. And at that point, the momentum of his car caused the light contact between he and Plumhoff, who was moving toward him as well. He doesn't have to hit his brakes hard. He had just — he had just exited the interstate down this road. Yeah. Isn't that a good reason for putting your brakes on? He's not going to be going 100 miles an hour down the side street, is he? No, no, no. He's well off the interstate. He has made at least four and maybe five turns since he left the interstate. And he is turning from north on Danny Thomas to northeast on Jackson Avenue. He sort of quarters into it. He has already made the turn before those brakes come on, according to Officer Forthman. Now — But, Mr. Smith, I was surprised to read what you said in your brief on page 25. At a minimum, reasonable minds could differ on the issue of the petitioner's objective reasonableness. And that — isn't that enough to decide this case? I respectfully submit no, Justice Scalia. You say that even though what they did was arguably reasonable, right, immunity does not apply. That statement, not prefaced correctly and perhaps inartfully, is simply saying this, that if you use the Rule 56 standard to view the facts in the light most favorable and thus you create a jury question, reasonable minds could differ with the jury. They could find for us. They could find against us. But it is not to say — No, we don't send it to the jury about whether, you know, whether they — the police officers violated the Fourth Amendment or not. The rule is if, indeed, there is no clear violation on their part, if they had no reason to know that what they were doing violated the Fourth Amendment, they're entitled to the immunity. And here you have that statement, at a reason — at a minimum, reasonable minds could differ on the issue of their objective reasonableness. Do you still believe that, that reasonable minds could differ on the issue of their objective reasonableness? It says at a minimum, and I — At a minimum. I mean, it could be even worse. That's addressing the constitutional issue, not the clearly established issue. I don't care what it's addressing. It's addressing a state of facts, that reasonable minds could differ on the issue of petitioner's — do you want to take that back? And it — no, because any — You want to take that back? Any time there is an issue, any time that there is a genuine issue of material fact, it can be resolved either way. Well, objective reasonableness is at least a mixed issue of law, in fact. And it seems to me, Justice Scalia, it's correct. You have the burden to show that this was a clearly established standard. And you say at a minimum, reasonable minds could differ on the issue of reasonableness. It's not what that was intended to convey. It was clearly not what that was intended to convey, as you can see from the entirety of the brief. If I can get back now to the material genuine issues, the fact that are in dispute, keep in mind, Officer Plumhoff, who shot those first three shots, did not do it to prevent the car from leaving again. He said the only reason that he fired those three shots was because he was standing directly in front of the path of that car and he thought he was going to be killed. And the video 100 percent shows that that is not true. But I thought the reasonableness of a Fourth Amendment seizure was an objective question, not a subjective question. It is an objective question. And why does it matter what reason he subjectively had? He has to have some justification of danger under objective reasonableness to make the decision to use deadly force. And he says that it was because he was standing in the path of the car. He wasn't. That car was bumper to bumper against the Gardner car. Alito, but if he says, I did it because I thought he was going to run me over, but an objective officer looking at the situation would say that the use of deadly force is necessary here to prevent this chase from continuing on the interstate and endangering other motorists and their passengers. So if that were the situation, wouldn't that mean that was a reasonable seizure? I believe it would not be. Would it be vitiated by the fact that the officer who used the force had a different motive? No. I respectfully submit to Justice Alito that it would not, because if that's all there was, there were other alternate methods to stop that car from leaving. It wasn't the reason that he did it, but if you assume that you can analyze it on that basis, there were several alternate ways to prevent that car from leaving. Such as what? You're standing right there beside the car. You can disable the car with the gun. You can shoot the tires. You have force. Are officers trained to use their weapons to shoot tires? They are trained to use weapons and they are trained to use, these officers trained, to use all safer alternatives before you use deadly force. Are they trained to use their weapons to shoot out the tires of fleeing cars? My understanding is that that's not appropriate police behavior. It is more appropriate, I would submit, than shooting the person. But they also have other alternatives here. He's blocked on three sides. The only thing he can do is back up. There are four cars to his left. I mean, excuse me, to his right. They have the ability to block him from the rear. There were alternative means. They could have done to stop him. But they didn't block him. He got away. How can you say they had the ability to block him? He got away, didn't he? My point is they could have. The other thing they could have done is they could have done Scott v. Harris. At low speed, you've got four cars to his right. Two of them occupied. Simply move into the car and hit it. There were other ways to stop. Breyer, I mean, when I looked at the film, I thought, well, sure, he's going back to the highway. You say we want to show that the policeman knew he wasn't. Knew he wasn't. I didn't see any evidence showing that, preferred or otherwise. But what you said is there. It doesn't show he knew that the guy wasn't going back to the car. Your second question you raise, which I think is a very good question, why didn't they shoot the tires up? And my answer to that is I don't know. I don't know. I've heard the same thing the Chief Justice has heard, and we've also seen the thing, and I, of course, it raises just the question you say. But since I don't know the answer, and since there's no evidence in the answer, and since there are no cases dealing with the answer, I begin to think I don't see how, you know, you can say it was clearly established that they had to shoot the tires up. It's a question I don't know the answer to. What am I supposed to do? Scalia Well, it is clearly established that the danger itself has to be the justification for the deadly force. That implies alternative measures. Scalia That's too general a rule, and our cases hold that you cannot appeal to a very general rule to say the law is clear. You have to show that the law, as applied to these circumstances, was clear. And there's nothing about shooting out tires that I know of. Well, shooting out tires, blocking pit maneuver, as was discussed in Scott v. Harris, least retrained in alternative methods. Breyer Is there — what is there in the record? When I saw the film, I saw your point. You have a point. But what I can't quite see is how it was a clearly established point. Maybe this is the case where you ought to go and, if you're suing somebody else, and introduce a lot of evidence that shows that they should shoot the tires up. And then there could be a decision on that. It comes up every so often. But am I right in thinking so far? There just hasn't been a case on it. There hasn't been an effort to do that. There hasn't. So I'm left in this uncertainty, which, unfortunately for you, means it wasn't clearly established. Scalia Well, the issue still, the threshold issue, is the choice of using deadly force based on the danger. In the first sequence, the danger is not established to that officer because he is standing beside that car. And remember this. Before Officer Plumhoff gets to that car, Officer Evans is already there. He didn't see the danger. He's got his gun pulled. He has hit it against the windshield. And he didn't see the need to shoot. And he had an opportunity before Officer Plumhoff did. And he never shot. Roberts Let's say there's only one police officer chasing this fellow. Same thing happens. You know, he turns off the interstate after the 100-mile-an-hour chase on the highway and it stops. The officer gets out of the car. He starts taking away again. Would it be appropriate for that officer to apply lethal force to prevent the vehicle from resuming the high-speed chase? Scalia It is going to depend, as this Court has said and other courts have said many times, on the factual context at that time. Roberts I've given you all the facts. I've given you all the pertinent facts. Is it appropriate for that officer to apply lethal force? Scalia The one fact that we haven't talked about is where he is at the time. Are we on an isolated country road? Are we at a dead end where he's got him surrounded? Roberts We're at the — let's start with the same place that he was at in this case. Scalia And the scenario is, as I understand it, we've had the same chase. Roberts Everything's the same except there's one police officer. And he goes off the interstate at that point. The same thing happens, but there's only one. And the officer gets out of the car. And at that point, the fellow takes off again, resuming the chase, endangering the public by doing so. At that point, can the officer apply lethal force? Scalia And since we've got two sequences here, I'm assuming we're talking about the second sequence. And the answer would clearly be no, because — Roberts Not two sequences, whatever. Just as I explained. Both cars are stopped. The officer gets out of the car. At that point, the driver that led the chase takes off again. That's all the facts you need to know. Scalia In this case, the first three shots occurred before he took off.  No, no, no. Not this case. The case that I have hypothesized. Scalia But in the hypothetical case, if you assume that he takes off, the answer would still be no, because in order to shoot him, you are shooting at a heavily populated residential area, at oncoming traffic, and you're endangering way more people by the way. So you can do damage with the vehicle. Roberts Is there any circumstance in which lethal force is appropriate once the officer has stopped the car? Scalia Certainly. Roberts It will — when? Scalia Well, if the person is armed, if they brandish a gun at the officer, if they drive straight at the officer, there's any number of circumstances where clearly lethal force would be appropriate. No question about that. But the — Alito What if the situation is that the officer has this choice? After a high-speed chase, after attempting to persuade the driver to get out of the car, the officer has one — has these choices. Allow the chase to continue or use lethal force. Your answer is they have to let the — they can use lethal force, they have to allow the chase to continue, what? Which? Scalia Depends on the context of the circumstances and whether the danger is sufficient to justify the use of deadly force. Scalia The danger is he's going to be going 100 miles an hour, okay? The chase up to now has been the way your client's chase was, in which he endangered a lot of other people, forced cars off the road and so forth. That's the hypothetical. Okay? That person is about to drive away and continue that kind of public endangering behavior. Can the policeman shoot or not? You could not as he's driving away because now you're endangering — you're actually endangering the people that you say you're trying to protect. No, no. There's nobody around, just him. If there's nobody around. There's nobody around. Can they shoot at him to stop him from endangering the public again? Under Scott v. Harris, I would say that you could because in Scott, they had the road clear, blocked, and they weren't going to endanger anyone else. You're just not willing to give answers, but we've been discussing this as though that's the question. What should the policeman do? But that's not the question. The question is, was there clearly established law that made it apparent that this was improper police conduct? That's the question. Not what is proper police conduct, but was there clearly established law that this was not proper police conduct? What's your best case for that? Smith v. Cupp, McCaskill v. Wilkins, going back to Garner, and all the cases— So how do you distinguish Brasso? In several ways. In Brasso, which held, by the way— This is the single — this is the single police officer trying to stop a fleeing suspect whose only activity was a reported fight in a residential neighborhood. Yes. And it's distinguishable in several ways, and it emphasizes the need for an imminent threat of harm to other people who were in the path, which happened to be four people in two cars that the officer had placed there and other officers also in the path of the egress. Also, that officer had tried alternate means. She tried to get the keys. She tried to arrest him. Why? She actually hit the guy with her gun before she shot, and there was no pass— That goes back to my 12-shot sequence, which I still have a problem with, in answering Justice Alito's question. He's already gone 100 miles an hour when he — the car moved away, even though that part of the street was deserted. Why would a reasonable officer not be suspicious that more reckless driving is going to occur to escape them when they finally get back into their cars? He may be more suspicious, but the decision at that point is going to endanger the life of the passenger, and those bullets did not discriminate. Those shots with the passenger in the car have to be viewed in terms of the officer's advantage of the fact that they occurred. But when you see that video, those 12 shots are fired, one, after he's been shot three times, but also they are fired where the ballistic circumstance could bring the bullets to civilians, residents. That's a heavily populated area and a heavily traveled street. Was she trying to get out of the car when he was trapped there in the — you know, surrounded by the police car? No indication. She didn't try to get out of the car. I mean, for all the police knew, she was a cohort of his. He fled. Why was he fleeing, by the way? He just didn't want to — didn't want to get a ticket for the broken headlight? Yeah. There's no record about it. No — I thought that there was some indication that he had drugs. There was contraband in the car. Hmm? There was contraband in the car. Yeah. So that's probably why he was fleeing. And she might have been a cohort of his. Are the police supposed to know that? She made no effort to get out of the car. Well, I don't know that she had in the four seconds time to get out of the car before the shooting began, but — Well, I think you think pretty quick in a situation like that, where this guy's been driving you on the highway at 100 miles an hour, swerving into and away from police cars. Boy, I would get out of that car so fast. What — what is the legal significance of the number of shots? Is this case any different because 15 shots were fired as opposed to one or two? I think primarily only because on that second sequence, you are shooting at the public just as much as you're shooting at the driver of that car. But I'm not clear how that works either. I suppose the police are very good shots. It doesn't hit the public. It just hits the assailant. Is it still unreasonable because it was in a public place? And does that mean that the fleeing felon is much better off if he goes to a public place? I think all — I don't understand how this bears on the question of whether or not it's a reasonableness as to the driver. The cases that have sustained qualified immunity have done so in part, in many cases large part, because of the propriety of the decision based on the protection of innocent people. Well, the converse of that has to be true as well, that you can't make a judgment to shoot just to stop someone fleeing when you may be endangering the lives of the innocents who, in this case, could be injured or killed not only by the bullets but also by the car. Well, again, what standing does the driver have to complain about the threat to civilians who are in the area? The question is different than that, Chief Justice Roberts. The question is when the officers know that there is a, quote, innocent or another person in the car, that should affect their judgment. That should be a factor in the determination of whether or not to start pulling that trigger. It's not that Mr. Rickert gets the advantage of it. It's that it should affect the officer's judgment. Scalia's Justice, but is it a factor that your clients can take advantage of? That's the issue. I mean, maybe you can demote the policeman who did that. Maybe even a lawsuit by the colleague in the car would be successful. But the issue is whether your client has any reason to complain about that. You're a client who caused the whole thing, who caused the shooting in the last analysis. There's no question that Mr. Rickert's conduct was unreasonable and he has culpability. But the issue is not him taking advantage of it, but the threshold issue is should they have used deadly force in that circumstance. And that passenger is there. We can't take away the fact that that passenger is there. And it should have been a factor in the reasonable officer's judgment about whether or not to initiate deadly force.  But what you have to say clearly establishes that. You say the passenger is there. What case tells a police officer when there's a passenger, no lethal weapon? There is no case that says specifically if there's a passenger there, don't use a weapon. But virtually every case talks about the impact of using lethal force to do it or not to do it when relative to innocents or third parties. It is just that is an obvious part of the judgment that should be made, is that you don't endanger those other than the suspect and you don't shoot or use deadly force on the suspect if it is going to endanger others. As to the number of shots, even with all the shots that were fired, Mr. Rickards still was able to drive away for a short distance. Yes. Isn't that right? Correct. What does that do to the argument that too many shots were fired? It's not so much that it was too many. It is that second phase of shots that are, if they do what they're intended to do, and by the way, they did, then you have created a moving missile by the car, because you're going to have a dead driver that can endanger other people, and you're shooting in the direction of other people. Both those factors should have militated against the second phase of shots. There are two ways in which the public is endangered. The point you're making, that if the police are firing, somebody in the public might get hit by the bullet. The point the officers make, that if you allow him to escape and continue a high-speed chase, there are other people, innocent people, who might get injured or killed by the car. Now, how are the officers supposed to decide on the spot whether there's a greater danger that people are going to get hit by a stray bullet or there's a greater danger that people are going to get hit by the car? Or, Chief Justice Roberts, a greater danger by a car driving down the road with a dead driver behind the wheel totally out of control. And that almost happened in this case, as you see in the video. There was an oncoming car just before he veered off to the left and hit that house. So you're saying they can't apply lethal force because they may not be successful in killing the driver. Using it on a moving car in a circumstance like that is the second sequence the car is moving. Okay. This is a new principle. You think it is clearly established law, clearly established law, that you cannot shoot to kill a driver whose car is moving. Is that it? If. Is that the principle you say is clearly established? If doing so. My goodness, they do it all the time. You watch the movies about bank robberies, you know? It happens all the time. Are these movies unrealistic? You cannot shoot to kill somebody in a moving car. In a circumstance. And that is not just your view. It is, you say, clearly established law. That was even referenced from in the Scott case, a distinction between using the type of force used in Scott to ram the vehicle and take it off the road versus shooting somebody. And that's what Scott holds. It doesn't hold that, but it references that distinction from versus Scott. Sir, you are arguing that the law is clearly established. That's the case you have to make. You can't just get up here and say you shouldn't shoot at somebody in a moving car to kill. Maybe you shouldn't. What is the clearly established law that policemen should have known? Vaughn v. Cox talks about not shooting someone in a moving car. And that is referenced. Talks about it? In Scott. Talks about it. And that's — which brings up a good point. I mean, the cases have uniformly held that the officers are not held to the standard of reading constitutional law, which invites the inquiry, well, how are they going to know what's clearly established law? That has to be from training, and in this case the policy and procedures, which are in the Joint Appendix, which closely tracks Graham, closely tracks Garner, closely tracks any number of other cases, including from their own circuit, McCaskill, which held that qualified immunity did not apply in a situation where the officer felt they were justified in shooting to avoid another escape. And those are the policies and procedures that are applicable to the state of knowledge of these officers when we look at clearly established law. And all of those authorities would support the fact that qualified immunity should not attach in this case under these circumstances. Ginsburg. What about the statement that there was a police manual that says once you are authorized to shoot, you can continue shooting until the job is done? I don't quarrel with that, except to the extent in this case, in that second sequence, that you're endangering other people other than the person that you're trying to stop. That's, that's the distinction. Now, before my time is through, I do want to go back to the jurisdictional question, because in the end, in this case, the interlocutory was taking nothing more than a challenge to the evidentiary sufficiency, the facts necessary to consider both prongs, the constitutional prong and the clearly established prong, are the same facts. There is a blending, though the consideration may have to be different. Scalia, what facts do you contest? And we'll just subtract them from the facts that we consider. Which facts do you contest? That he was driving 100 miles an hour, swerving on the road, swerved towards police cars, almost caused another car to go, that's, you don't contest that? We challenge that the car was a danger at the time of the shooting stop. We challenge that there was any danger. That's not a fact. That's a conclusion. Whether the car was a danger is a legal conclusion, not a fact. What facts do you say are contested? If we talk first about the chase part before the stop, then there is contested facts about whether or not there were assaults, because the video does not confirm that. And the officer's own testimony was that there were no assaults. What else? Then when we get to the stop, they say that he rammed the cars three times. We clearly contest that. All right, we'll eliminate the ramming. What else? They contend that Officer Ellis was in danger, and that that was a justification for the shooting. Officer Ellis. Let's assume, we'll assume he was not in danger, okay? Officer, we contest that Officer Ellis was in danger. But we are still left with a very dangerous man careening down the road who is surrounded by police cars and still tries to get away to continue his careening. You can eliminate all those minor facts that you're contesting. And it's still a very dangerous situation. And he did not make the move to get away until after he'd been shot three times. Thank you, counsel. Mr. Mosley, you have four minutes remaining. Very briefly, in reply- Just to clarify one thing, Mr. Mosley, when were the three shots fired, when he had moved backwards? The three shots were fired, if you look at dash cam unit 286, at 12 colon 17 colon 42 is where the strikes of the car begin. And the shot begins, the first shot of the three begins at 12 colon 17 colon 45, three seconds after the first contact was made. I'm sorry. I don't know that you answered my question. I'd like to. When he- We don't care about the seconds. Okay. We don't care about the seconds. I just asked, the car, I thought the shots were fired after he had moved backwards. The shot- Away from where the officers had initially stopped him. That's correct, Your Honor. And then he moved backwards, he was next to the building, he goes forward briefly three times, you can characterize it however you want to, unit 286 shows it very clearly. Then shots are fired after the beginning of that, and then he backs out and more shots are fired as he backs out and drives away. Got it. The Petitioners did raise in their brief in support below that Officers Forthman, Officers Ellis, and Officers Evans did not use deadly force. We clearly raised it in our brief in support, and it was not addressed. And it was not addressed at the Sixth Circuit either, and it's fantastical to suggest otherwise. Cole versus Bone, Justice Breyer, does show that shooting tires doesn't work. It only creates a more dangerous situation. In that case, they did shoot out the tires in the Eighth Circuit, and the vehicle kept careening on. It can create a ricochet. Now, that's not in the record, but Cole versus Bone is certainly cited in our brief. Otherwise, unless there's any further questions. Mr. Mosley, just out of curiosity, does this police department actually have rules for what a police officer is supposed to do when there's a fleeing vehicle? Were they acting in accordance or not in accordance with certain rules that the police department had? Justice Kagan, in the volume two of the joint appendix, there are such rules. I submit to you that they were acting substantially in compliance with those rules. What were they? I mean, I don't know. Well, they're fairly lengthy. But there's very specific rules on engaging in high-speed pursuits, very specific rules in the use of deadly force. And I submit that given the rapidly evolving circumstance in this case, these officers did the best they could and were compliant with those rules. Although those rules do not set a constitutional standard, this Court does. If there's no further questions, I'd like to rest. Thank you, counsel. Counsel, the case is submitted.